May it please the court, Brad Mogan for Christopher Perez. In the early days of the COVID-19 pandemic, Christopher Perez falsely claimed on Facebook that he had paid someone who was infected with COVID-19 to lick items at two specific HEV grocery stores in downtown San Antonio. For that, the government prosecuted him for committing a hoax about biological warfare under a statute that was passed to implement an international convention on biological warfare and terrorism. The jury found him guilty of committing the hoax, and the district court sentenced him to 15 months imprisonment, a term of supervised release, and $1,200 in financial penalties. On appeal, Perez challenges both his conviction and his sentence. I don't plan on addressing the sentencing challenge because the government has conceded that issue. That was just a mathematical error? Correct, in the calculation of his criminal history score and the guidelines. So I'll focus on the challenge to the conviction, and that is a two-pronged challenge. The first argument that Perez makes, which I'll refer to as the bond argument because it's based on the Supreme Court's decision in Bond v. United States, is that Congress did not clearly indicate that the biological weapons statute, which formed the basis for his conviction, was intended to target the kind of purely local conduct that Perez claimed to have happened here. We also make a second argument that his prosecution for committing this hoax violates the First Amendment. But I'll focus on the bond argument because that's the narrower ground on which the court can decide the case, and if the court agrees with me on that, it wouldn't be necessary to reach the First Amendment issue and the implications for the hoax statute there. So this case is materially indistinguishable from Bond v. United States. What happened in Bond was that Bond was seeking to get revenge on her husband's lover, and so put some caustic chemicals on the other woman's doorknob, car door, and mailbox in hopes that it might cause a mild chemical burn, and had done it around 24 times. The government prosecuted Bond under 18 U.S.C. Section 229, which is very similar to the 175 statute at issue here. So Section 229 makes it a crime to develop, produce, otherwise acquire, transfer, receive, stockpile, retain, own, possess, or use any chemical weapon. And of course it was passed to implement an international convention on chemical weapons, which was ratified in the wake of the Iran-Iraq War, where such weapons had been used. There was a follow-on to an earlier treaty in the wake of World War II, which was in response to the horrors of the use of poison gas on the battlefield. So the Supreme Court, in reviewing Bond's conviction, said that statutory interpretation doesn't begin and end with the plain text of the statute. So even though Bond's conduct appeared to fit within the literal language of Section 229, the Supreme Court recognized that when Congress passed, well, that Congress doesn't usually pass statutes that tread on areas of traditional state authority that fall within a state's police powers. We saw this argument about Bond, I believe it's in the government's brief, this assertion. Do you accept that what occurred here would fall under this statute, 175, but for the part of Bond that you're talking about? Well, the, so there's, it's important to separate the two aspects of this. There's the hoax statute and there's the biological weapons statute. But the predicate for the hoax under the, sorry, the hoax has to be about something that would be a crime under any of certain specified federal statutes. So here that's 175, that's the biological weapons statute. Okay. Two statutes involved. One's a threat, one is the biological threat that, offense that he committed. But under 175, are you saying what your client asserted had been done would fall under 175, but you need Bond to pull it out of 175? Well, I wouldn't say pull it out. So the conduct that he, that Perez claimed to have happened, under a literal reading of 175, it would apply because the, because the claim. All right, we've seen the language. Are you accepting that 175 would apply? Yes, that 175 would apply. But as in Bond, the court has to interpret the statute against the background of the And that's because the conduct that Perez lied about, that he claimed to have happened, was purely local in nature. He said that someone had licked items and was going to lick items at two specific grocery stores in San Antonio, Texas. So it's not like he claimed that someone was going around all over the country licking items in grocery stores, or even that someone was licking items at grocery stores in Texas. He identified two specific HEB grocery stores, not even in San Antonio generally, but in downtown San Antonio. And so it's hard to imagine a threat more localized than that. And Bond tells us that when the conduct is purely local, that the court has to read the statute with federalism concerns in mind. And so in Bond, the court found that there were three key problems with the statute. One was the improbably broad reach of Section 229 and its use of the term chemical weapon, which in normal parlance, when people hear the term chemical weapon, probably aren't thinking about ordinary household chemicals that anyone might have in the home, like bleach or ammonia. But under the literal text of Section 229 in the related definitional sections, what Bond did would fit with that. But— What do you do with the hail, H-A-L-E? I mean, it was localized, mailing to a single person, not even publicizing it, as I recall the facts. Is that consistent with your argument? Yes, it is. And that ties into Bond as well. So the biological agent in hail was hantavirus, which is an extreme— The problem there is more dangerous as opposed—I'm sorry, you're going at the level of dangerousness or something else? Yes. You're talking about terrorism and sort of widespread effects. And hail is one person, the bankruptcy trustee, who is getting this biological agent. Yes, and this goes back to Bond. So in Bond, part of the problem was that, you know, the reach of the literal language of the statute wasn't probably broad because it would include things people wouldn't typically consider weapons of war or things that would be used in combat or in an act of terror. Hantavirus is far more dangerous than COVID-19. It's extremely virulent. It's more deadly, far more deadly than COVID-19 is. And so— Does it matter whether HEB was intrastate or interstate? No, that doesn't matter. I mean, there were arguable interstate connections in Bond as well. One of the chemicals that Bond used, she had purchased on Amazon. And also, she had spread the chemicals on the victim's mailbox, among other places. So arguably, that implicates a federal interest in protecting the mails. But that was not enough in Bond for the Supreme Court to find that Congress had clearly indicated an intent for that statute to reach such conduct. And so, turning back to Hantavirus, that's the type of biological agent, along with ricin, which is in some of the other cases, that ordinarily you would think is the type of agent that would be used in an act of terrorism or as a weapon of war. Here, the claim was that someone who had COVID-19 was licking groceries in a grocery store. Now, I'm not trying to minimize the seriousness of COVID. It's had a dramatic effect on our country and around the world. But its case fatality rate is far lower than something like Hantavirus or ricin. Ricin kills something like half the people who are exposed to it. The fatality rate for COVID is in the single digits. Also, the claimed mode of transmission here, licking groceries, simply isn't a viable method of transmitting COVID. Certainly not in the sense of someone who would mean to use COVID as an agent for terrorism. Are you using it as an issue under 175 or under 1038? So, under 175, because— The point that you were just making about it not being a viable method of transmission, is that part of the reasonableness of the hoax? Or is that part of your argument about 175? It's about 175. So, under 1038, the hoax statute, the claim has to be reasonably believable. And the jury found this was a contested issue at trial, whether anyone could reasonably believe that Perez had, in fact, paid somebody to do this. Was there an issue below about HEB being engaged in interstate commerce? Well, there was testimony that HEB has several hundred stores in Texas and northern Mexico, and that is a large grocery retailer. I mean, it is the type of business. And they deal in products that are in interstate commerce. It does. But again, the interstate commerce nexus was present in Bond as well. And also, one of the cases that Bond talked about, an earlier Supreme Court case, Jones v. United States, which involved a federal arson statute that included any property used in interstate or foreign commerce or any property used in activity affecting interstate or foreign commerce. And the Supreme Court recognized that reading that language literally would reach virtually every single building in the United States. But the court, with federalism principles in mind, wouldn't give the statute that literal reading. Instead, it said that it would only reach properties or buildings that are used in active employment for commercial purposes. And in Jones itself, it was an owner-occupied private residence. So the simple presence of some kind of commerce nexus on the facts of the case doesn't necessarily mean that Congress clearly intended to reach conduct that would traditionally be something within a state's police powers. And that's why the Supreme Court said that the statute in Bond didn't reach that conduct. And again, this case is identical in material respects, both in the nature of the statute that Paris and Bond were convicted under and the purpose of the statute, which was to prevent bona fide chemical and biological weapons from being used in warfare and acts of terrorism. Unless the court has any other questions on the Bond issue, I'll just turn briefly to the First Amendment issue. So we've made three arguments about 1038, the Hoek statute, that it's facially overbroad, that it's unconstitutional as applied to Paris, and that it has an overbreadth problem as well. And I'll just talk about the as applied because, again, that's the narrowest ground in which the court could resolve that issue. So it's unconstitutional as applied because it criminalizes speech that doesn't fit within any of the categories that the Supreme Court has said are unprotected by the First Amendment. So the government has argued that the speech here would be exempt from First Amendment protection either as a true threat or as a hoax about something, a matter of grave concern over which the federal government has the power to prevent. So as to the threat, even if one could reasonably believe that Paris had actually done what he claimed, which is paying somebody to lick items in a grocery store, still the claimed act is absurd on its face. Paris claimed that this person would lick everything in a grocery store. One of my problems with your argument, which was in the brief, you may be right, but this threat was issued at the beginning of the pandemic. And what we think we know now and what we were concerned about two years ago are much different. And it seems to me the government's point that it was a very viable hoax, perhaps as a threat, it was a very viable threat in 2020. People didn't know it couldn't be transmitted very effectively through surface contact. People were wiping the mail off when they got it. There was just uncertainty completely. How does that fit into your argument? Well, it's still, for it to fall outside of First Amendment protection, it has to be a matter that the federal government has power over. And that essentially loops back to the 175 issue. Whether Congress theoretically has the power to pass 175 under any of its enumerated powers is an exercise of the treaty power, which was one of the issues involved. If Congress did not actually reach this conduct, then you don't have the 175 hook for the hoax statute. And so it wouldn't reach Paris' conduct. Thank you, Your Honor, and may it please the court. Jeffrey Smith for the United States. The defendant's conviction should be affirmed. Now, I take it from my colleague's presentation that we agree that the putative conduct, the conduct that the defendant claimed falsely to have occurred, violates the text of Section 175, and that the only issue regarding the statutory argument is what he refers to as the Bond argument. Assuming, arguendo, that Bond applies to Section 175, Bond, of course, decided how to interpret Section 229. Assuming, arguendo. We'll make more of a push of that. I know this is all an argument, you can't cover everything, but your brief really does push back fairly strongly against that. But I don't see the difference between chemical weapons banned, biological weapons banned. If, in fact, we are using statutes passed by the federal government that are intended to deal with terrorism at that level, I don't see a distinction between Bond in our case. I think it applies in the same way, but I don't see why that same theory doesn't need to be dealt with. Well, Your Honor, I think there's different ways you can come at it. I think at one level, the passage or the transfer of a virus that causes a communicative disease is inherently non-local, and so it differs from the type of chemicals that are regulated by 229, which include things like dishwashing soap or even vinegar, as the Supreme Court noted. Now, you could say, well, Bond shouldn't be extended. Alternatively, you could say, well, it's never going to be purely local, so even if we apply the Bond analysis to infectious diseases, we're going to come to the same conclusion. But I do want to, if I could, address, assuming that you do determine that Bond applies in the same way to 175, if we look to the text of Bond, there are at least three independent reasons why the putative crime, that is the falsely claimed underlying crime in this case, was not purely local. First, the Supreme Court explains that the purely local category does not include crimes that involve extremely dangerous substances with the potential to cause severe harm to many people. And in saying that, the court favorably cited the Eighth Circuit's decision in Gahn, G-H-A-N-E, which is cited in our brief, a case in which the defendant merely possessed chemicals in a cabinet for the possibility of committing suicide. But because the nature of the chemicals was sufficiently dangerous, it was a legitimate federal concern. COVID, it simply can't be argued against the idea that COVID has the potential to cause severe harm to many people. It's killed over a million people in the United States and many more worldwide. Moving on to the second point, the Supreme Court in Bond says that the purely local carve-out does not include, quote, acts with the potential to cause mass suffering. This is a similar, although not exactly the same test, because it looks at the defendant's conduct rather than the substance at issue. But here you get the same result. The idea of spreading COVID on surfaces at a highly trafficked grocery store is the type of act that has the potential to cause mass suffering. The defendant says that the crime wouldn't work. There's nothing in the record to support that. And while it is certainly the case that there was extreme concern about surface transmission at that time, and now there is as much or more concern about air droplet transmission, we've learned a lot about how it spread, there is no evidence that it cannot spread by surfaces. What does that do to your argument? What part of your case does that affect if the evidence was there that it can't really be transmitted by surface? Is that part of 1038 or is it part of 175? I don't think it's actually relevant at all, Your Honor. But to the extent that you think it's relevant, I think the defendant's... Why would it not be relevant? So it's not relevant... So let me step back. It could be relevant to the 1038 in the following scenario. If somebody made a threat or a hoax that a common person would know would never work, like if somebody said, I'm going to say a prayer to the gods and have acid rain all over the city, that would be relevant under the second prong of 1038 because it has to be under circumstances where such information may reasonably be believed. So if no one could believe at the time that the hoax was made that this could have happened, then that would be relevant. But the issue as to whether this threat could reasonably have been believed was the issue that was presented to the jury. It was the sole issue the defendant disputed at trial, and the jury found against him, and the district court agreed, denying his Rule 29 and saying that his conduct was incredibly reckless and could have caused a mass panic. And the third area of Bond that I'd like to focus on, and this goes to perhaps some of Judge Wiener's questions earlier, in Bond, the court analogized and drew upon its own precedent in interpreting the federal arson statute. As my colleague, indeed, mentioned, he talked about the case of Jones, which they did indeed cite. Now, in the federal arson statute, the court has, in fact, found that some types of arson are properly seen as punishable by state law, while others, well, not carved out of state law, but are properly punished as violations of the federal arson statute. And the line is, owner-occupied residential housing is generally not covered by the federal arson statute, whereas commercial businesses are covered by the federal arson statute. There's no question that if somebody had burned down one of these H-E-B stores or attempted to, that that would violate the federal arson statute. Similarly, there's no question that if there had been a robbery of one of these H-E-B stores, that that would violate the Hobbs Act because of the effect on interstate commerce. My colleague points to Bond and says, well, there was interstate commerce there, too, but that's not really correct. While it is factually correct that Ms. Bond ordered chemicals over the Internet, that had nothing to do with the elements of the crime for which she was charged. She was charged for usage, not acquisition or possession, and the usage that she was charged for was mixing chemicals and using them to assault her husband's lover. He also points to the existence of the mailbox, and the mailbox was one of the surfaces that Ms. Bond contaminated. But the question in Bond is not whether there is an abstract federal interest. The question is whether the crime is, quote, purely local, unquote. The existence of a mailbox by itself doesn't affect locality versus non-locality, but the existence of a business in interstate commerce absolutely does. And had this crime that the defendant falsely claimed to have committed, had it actually been committed, there's no question that even if there had been no actual spread of COVID, and that's far from clear, there's no question that the stores would have had to be shut down. There's no question that substantial amounts of merchandise would have to be destroyed. There would be an effect on interstate commerce which is sufficient to make this crime a non-local crime. If there's no further questions on that, I'll move to the defendant's First Amendment argument. The defendant in his brief relies primarily on the Supreme Court's opinion in Alvarez, or I should say opinions, because there's a plurality opinion and a concurring opinion. But both of those opinions make clear that Congress can prohibit speech where it is false speech that is likely to cause an imminent harm. The plurality gives examples, favorably citing to statutes that do this properly. The plurality mentions 18 U.S.C. 1001, which punishes false statements to government agents. The plurality also mentions Section 912, which punishes falsely impersonating government officials. And the concurring opinion cites a number of even more statutes, including 1038 itself. Additionally, every court to have addressed the issue has found that 1038 is consistent with the First Amendment of the Constitution, including the Ninth Circuit in Kaiser. The Eighth Circuit in Williams addressed a very similar statute, and both of those cases applied Alvarez and found that the First Amendment does not protect these types of hoaxes where somebody falsely claims to have committed or be in the process of committing a serious crime that could harm people. And then finally, as to Mr. Perez's as-applied challenge, there's nothing about his personal conduct that would take it out of the run of the bill of 1038 or the First Amendment. He has said at some times that he was just joking. That's belied by his own allocution when he said that he actually wanted to be taken seriously because he wanted to change people's behavior. But even if he was just joking, it was joking in the way of playing a prank on people. That is, finding it amusing that other people were scared by his conduct. It's not the type of joking where the audience is in on the joke, as in a satirical performance, that would be First Amendment protected. So if there are no further questions... I do have some questions. You left the first part of your argument. Oh, yes, please. Let me take you back to that. Looking at 175, we're dealing with something that caused a pandemic, so obviously a very serious virus. I wonder where you would draw the line on 175 rather than saying he has a friend infected with COVID doing this. He has somebody... He himself has the flu, and he breathes on all this produce. Is that enough? Isn't that a biological toxin that can make people sick? We have the same issues of transmission, but that doesn't differentiate your case. Well, Your Honor... Is it the seriousness of the outcome? And if so, where is that line? Well, Your Honor, I do think both the seriousness of the outcome and the degree of spread that one can expect are relevant. My colleague talked about, for example, ricin and saying, well, ricin is more likely to kill you than COVID, which is certainly true, but ricin is also less likely to move from person to person to person. In fact, the fact that COVID doesn't kill most of the people who are infected is part of what makes it non-local, so much so because it spreads...  tend to spread it to other people and onward and onward, and throughout that, you end up then, even if only 1% or 2% of people or less are dying, you end up with over a million deaths in the United States. I understand... I mean, it's hard to do. There's not a lot of law in this area, but it seems to me that each of you have a fair argument that what's happened here is somewhere between what is clearly covered by these statutes and what is clearly not covered by 175 at least. And so it does seem to me that... I mentioned the flu virus, less contagious perhaps, less harmful, but it's a scale, a sliding scale of some sort, and I'm worried that if you were taking this down a path that it's really opening up abuse of this statute. This is a naturally occurring virus. No matter how it started, but naturally occurring now virus and spread naturally. It's not a good fit for what 175 is trying to address. Well, Your Honor, I think I understand your concerns. I'm not sure that I can draw a precise line. I think what I would recommend is going back to the text of Bond and the factors that I talked about. I think certainly the case of the flu, it's not as dangerous, it doesn't have as much potential to cause severe harm as COVID does. I think, again, the target, as I said earlier, the fact that he targeted a business, Interstate Commerce, is relevant here. That could be, obviously, your flu hypothetical could be something similar to that, although it's less likely that you would end up having to shut down a store for that. Let's say there was no 1038 offense that some law enforcement person or some witness saw and then found out later the person was determined to have COVID, saw somebody licking fruit inside an HEV. Is that a 175 offense? I think if the person is attempting to transfer COVID to other people, then I think it is a 175 offense. I mean, this actually does cover attempts as well as completed offenses. You know, here you have a situation... Sounds like a local offense that I just described. The spread of a biological contagious disease. Somebody witnessing a COVID-infected person licking an apple. Sounds like a local offense. Well, you know, if you have sort of a single incidence of him licking one apple, then... Or him licking 10 apples. Or 10 apples. It's localizable in the sense that you can throw away those apples and you're fine. What you have here is a situation where the threat was that he licked things throughout the store and with no direction as to... No one witnessed it. No one knew what was going to happen. And so you don't have that, you know, potential localizable ability. All right, counsel. Sorry? That's a sufficient response. Thank you. Thank you, Your Honor. With that, I would ask that the court affirm the convictions. Thank you. All right, thank you, Mr. Smith. Mr. Bogan for a vote. Judge Southwick, I'd like to address a couple of the questions that you posed to the government, which is whether there's any limiting principle or any limit on the scope of the definition of biological agent in the reach of 175 and whether it would apply... Take these same facts but assume flu instead of COVID. And I didn't hear the government say that, yes, there is a line that something like flu, no, that's not enough. COVID's serious enough that it is. So under the literal reading of the statute, which the government seems to be backing or at least not backing away from, then yes, this 175 under the literal text of the statute could potentially apply to something like that. And that's why Bond said that when a statute reaches so improbably broadly that the court has to take a second look and see if Congress clearly indicated that it meant for the statute to reach this kind of conduct. Also, the hypothetical... Suppose that Peres hadn't lied about this. Suppose it was just a pure 175 prosecution and he or somebody else who was infected with COVID was licking apples in a grocery store and the government suggested it would depend on the person's intent. But even under the text of 175, the intent wouldn't really matter because as relevant here, it just says whoever knowingly transfers any biological agent for use as a weapon has committed a crime. Now, for use of a weapon might suggest some intent requirement except that in the statute for use of a weapon is defined circularly to be the development, production, transfer, acquisition, and so forth, all of the acts that the statute itself prevents subject to an exception for prophylactic, protective, bona fide research, or other peaceful purposes. But I'm not sure what other peaceful purposes even means in that statute. I don't know if it has to be read in conjunction with the other exceptions which I suppose would include research or transfer among government facilities. But it's not at all clear that the statute on its face would not apply to somebody who happens to be infected with COVID or the flu and who knows that and then goes and licks apples in a grocery store. And that's what Bond was getting at. Would an ordinary English speaker, as Bond put it, think that this statute was meant to reach that kind of local conduct? And I'll just end by saying I think the government accepts that the Bond analysis would be an appropriate framework here. And it's true that Bond itself said that it was an unusual case and a curious case. Well, so is this one. To my knowledge, and I suppose the government could correct me on that if I'm wrong, but this is one of only two such prosecutions that the federal government has brought in the United States. The other one in Florida, it wasn't a hoax. It was a man who had spit and coughed on police officers and told them he was infected with COVID. And the government initially charged him with committing an offense under 175 and then later dismissed the prosecution, saying in part that the reason those two was because the government had concluded that the litigation risk posed to the offense statute does not warrant continued prosecution, which suggests that the government maybe had some doubts about whether 175 in fact reaches this far. And again, this seems to be the only other case where the government has prosecuted it. So it is every much an outlier, as Bond was, and Bond should dictate the same result here. All right. Thank you, Mr. Logan. Your case is under submission. Thank you.